UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALPARI (US) LLC, on behalf of itself and all others similarly situated, | |
| Plaintiff, | No. 17 Civ. 05278 (LGS) |
| -against- | |
| BNP PARIBAS, S.A. | |
| Defendant. | |
| ALPARI (US) LLC, on behalf of itself and all others similarly situated, | |
| Plaintiff, | |
| -against- | No. 17 Civ. 05282 (LGS) |
| CREDIT SUISSE GROUP AG; CREDIT SUISSE AG; and CREDIT SUISSE SECURITIES (USA), LLC, | |
| Defendants. | |
| ALPARI (US) LLC, on behalf of itself and all others similarly situated, | |
| Plaintiff, | |
| - against - | No. 17 Civ. 05284 (LGS) |
| ROYAL BANK OF SCOTLAND GROUP PLC and RBS SECURITIES, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERATIVE, TO DISMISS THE AMENDED COMPLAINTS ON GROUNDS OF *FORUM NON CONVENIENS***

# TABLE OF CONTENTS

P<small>AGE</small>

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .....................................................................................................................2

    A.    Alpari's and the Class Members' Claims ................................................2

    B.    The NFA's Mandatory Arbitration Program ............................................3

        1.    NFA Members ...................................................................3

        2.    NFA Member Arbitration Rules ..........................................4

    C.    Alpari's Electronic Platform and the Pricing and Liquidity Agreements...............5

    D.    The Prime Brokerage Agreements...........................................................7

ARGUMENT ........................................................................................................................10

I. ALPARI'S CLAIMS ARE SUBJECT TO MANDATORY ARBITRATION..........................10

    A.    Standard of Review..................................................................................10

    B.    Alpari's Claims Are Subject To Mandatory NFA Arbitration ..............11

    C.    Alpari Separately Agreed To Arbitrate Claims Against Credit Suisse and RBS ...............12

        1.    Alpari's Claims Fall Within the Scope of the Agreements To Arbitrate with Credit Suisse and RBS ...............12

        2.    Alpari's Attempt To Avoid Arbitration by Artful Pleading Is Unavailing...............15

II. ALPARI'S CLAIMS SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS* .........18

    A.    Standard of Review..................................................................................18

    B.    Alpari's Claims Against BNPP Are Subject to Dismissal For *Forum Non Conveniens* Based on the BNPP Pricing and Liquidity Agreement ...............20

        1.    The Forum Selection Clause in the BNPP Pricing and Liquidity Agreement Was Reasonably Communicated to Alpari ...............21

        2.    The Forum Selection Clause of the BNPP Pricing and Liquidity Agreement Is Mandatory ...............21

3.      The Claims at Issue and Parties to the BNPP Liquidity Agreement
        Are Subject to the Forum Selection Clause ...............................................22

C.      Alpari's Claims Against Credit Suisse and RBS Are Subject to Dismissal
        For *Forum Non Conveniens* Based on the Prime Brokerage Agreements.............24

        1.      The Prime Brokerage Agreement Clauses Providing for England as
                the Exclusive Forum Were Reasonably Communicated to Alpari ...........25

        2.      The Prime Brokerage Agreement Clauses Are Mandatory ......................26

        3.      The Prime Brokerage Agreement Clauses Cover the Parties and
                Claims at Issue ..........................................................................................26

CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Aguas Lenders Recovery Grp. L.L.C. v. Suez, S.A.*,
   585 F.3d 696 (2d Cir. 2009) ............................................................... 25, 27

*Alfa Laval U.S. Treasury v. Nat'l Union Fire Ins. Co. of Pitt.*,
   857 F. Supp. 2d 404 (S.D.N.Y. 2012) .................................................. 17

*Alliance Bernstein v. Schaffran*,
   445 F.3d 121 (2d Cir. 2006) ............................................................... 11

*AT&T Mobility L.L.C. v. Concepcion*,
   563 U.S. 333 (2011) ........................................................................... 10

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. Of Tex.*,
   134 S. Ct. 568 (2013) ..................................................................... 18, 19, 20

*Bensadoun v. Jobe-Riat*,
   316 F.3d 171 (2d Cir. 2003) ............................................................... 11

*Bense v. Interstate Battery Sys., Inc.*,
   683 F.2d 718 (2d Cir. 1982) ............................................................... 19

*Bluefire Wireless, Inc. v. Cloud9 Mobile Commc'ns, Ltd.*,
   No. 09-CV-7268, 2009 WL 4907060 (S.D.N.Y. Dec. 21, 2009) ........... 19

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ............................................................... 11

*Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*,
   189 F.3d 289 (2d Cir. 1999) ............................................................... 10

*Citigroup Glob. Mkts. v. Preis*,
   No. 14 Civ. 08487 (LGS), 2015 WL 1782135 (S.D.N.Y. Apr. 14, 2015) ........... 10

*Collins & Aikman Prods. Co. v. Bldg. Sys.*,
   58 F.3d 16 (2d Cir. 1995) ............................................................... 12-13, 13

*Consolidated Rail Corp. v. Metropolitan Transp. Auth.*,
   No. 95 Civ. 2142 (LAP), 1996 WL 137587 (S.D.N.Y. Mar. 22, 1996) ........... 13

*Coudert v. Paine Webber Jackson & Curtis*,
   705 F.2d 78 (2d Cir. 1983) ............................................................... 16

*Cuno, Inc. v. Hayward Indus. Prods.*,
   No. 03 Civ. 3076 (MBM), 2005 WL 1123877 (S.D.N.Y. May 11, 2005) ........... 29

PAGE(S)

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003) ................................................. 15

*Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*,
  No. 99 CIV. 10550 (SHS), 2000 WL 1277597 (S.D.N.Y. Sept. 7, 2000) ........................ 27, 29

*F5 Capital v. RBS Sec., Inc.*,
  No. 3:14-cv-1469 (VLB), 2015 WL 5797019 (D. Conn. Sept. 30, 2015),
  *aff'd*, 692 F. App'x 66 (2d Cir. 2017) ................................................. 27

*Fili Shipping Co. Ltd. v. Premium Nafta Prods. Ltd.*,
  [2007] UKHL 40 ................................................. 22, 22-23, 23

*Forgione v. Gaglio*,
  No. 13 CIV. 9061 (KPF), 2015 WL 718270 (S.D.N.Y. Feb. 13, 2015) ................................................. 3

*Giordano v. UBS, AG*,
  134 F. Supp. 3d 697 (S.D.N.Y. 2015) ................................................. 18, 20

*Glob. Maritime Inv. Cyprus Ltd. v. O.W. Supply & Trading A/S*,
  [2015] EWHC 2690 ................................................. 22-23

*Glob. Seafood Inc. v. Bantry Bay Mussels Ltd.*,
  659 F.3d 221 (2d Cir. 2011) ................................................. 26

*Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*,
  246 F.3d 219 (2d Cir. 2001) ................................................. 10

*Ikon Global Mkts., Inc. v. CFTC*,
  859 F. Supp. 2d 162 (D.D.C. 2012) ................................................. 3

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
  387 F.3d 163 (2d Cir. 2004) ................................................. 13, 15, 15-16, 17

*KTV Media Int'l, Inc. v. Galaxy Grp., L.L.C.*,
  812 F. Supp. 2d 377 (S.D.N.Y. 2011) ................................................. 27

*Laspata DeCaro Studio Corp. v. Rimowa GmbH*,
  No. 16 Civ. 934 (LGS), 2017 WL 1906863 (S.D.N.Y. May 8, 2017) ................................................. 19, 22

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*,
  67 F.3d 20 (2d Cir. 1995) ................................................. 13

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
  No. 11 MDL 2262 NRB, 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ................................................. 29

*Lipcon v. Underwriters at Lloyd's, London*,
  148 F.3d 1285 (11th Cir. 1998) ................................................. 27

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*,
  252 F.3d 218 (2d Cir. 2001) ................................................. 12, 13

PAGE(S)

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972) ................................................................. 19

*Magi XXI, Inc. v. Stato della Città del Vaticano*,
  818 F. Supp. 2d 597 (E.D.N.Y. 2011) ................................... 25

*Magi XXI, Inc. v. Stato della Città del Vaticano*,
  714 F.3d 714 (2d Cir. 2013) .......................................... 19, 27

*Martinez v. Bloomberg LP*,
  740 F.3d 211 (2d Cir. 2014) ............... 11, 18, 19, 20, 22, 22-23, 23

*McCowan v. Sears, Roebuck & Co.*,
  908 F.2d 1099 (2d Cir. 1990) .............................................. 16

*McMahan Sec. Co. L.P. v. Forum Capital Mkts. L.P.*,
  35 F.3d 82 (2d Cir. 1994) .............................................. 10, 11

*Mehler v. Terminix Int'l Co. L.P.*,
  205 F.3d 44 (2d Cir. 2000) .................................................. 16

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017) .................................................. 11

*Mosca v. Doctors Assocs.*,
  852 F. Supp. 152 (E.D.N.Y. 1993) ....................................... 16

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ......................................................... 10, 18

*Norcom Elecs. Corp. v. CIM USA Inc.*,
  104 F. Supp. 2d 198 (S.D.N.Y. 2000) .................................... 16

*Overseas Ventures, L.L.C. v. Row Mgmt., Ltd.*,
  No. 12 Civ. 1033 (PAE), 2012 WL 5363782 (S.D.N.Y. Oct. 26, 2012) ............................. 28

*Phillips v. Audio Active, Ltd.*,
  494 F.3d 378 (2d Cir. 2007) ........................... 19, 20, 22, 24, 29

*Popper v. Monroe*,
  673 F. Supp. 1228 (S.D.N.Y. 1987) ...................................... 13

*ProShares Tr. v. Schnall*,
  695 F. Supp. 2d 76 (S.D.N.Y. 2010) ..................................... 11

*In re Refco Inc., Sec. Litig.*,
  No. 07-MDL 1902 (JSR), 2009 WL 5548666 (S.D.N.Y. Nov. 16, 2009) ............................. 27

*Roby v. Corp. of Lloyd's*,
  996 F.2d 1353 (2d Cir. 1993) .............................................. 24

PAGE(S)

*Sabal Ltd. LP v. Deutsche Bank AG*,
   209 F. Supp. 3d 907 (W.D. Tex. 2016) ............................................... 25

*SFM Holdings, Ltd. v. Banc of Am. Sec., L.L.C.*,
   600 F.3d 1334 (11th Cir. 2010) ........................................................ 28

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
   549 U.S. 422 (2007) ......................................................................... 19

*Smith v. Smith*,
   No. 3:14-CV-00707-ST, 2014 WL 5462023 (D. Or. Oct. 27, 2014) ............................. 16-17

*TradeComet.com L.L.C. v. Google, Inc.*,
   647 F.3d 472 (2d Cir. 2011) ......................................................... 19, 20

*UBS AG v. HSH Nordbank AG*,
   [2009] EWCA (Civ) 585 .................................................................. 23

*Ujvari v. 1stdibs.com, Inc.*,
   No. 16 Civ. 2216 (PGG), 2017 WL 4082309
   (S.D.N.Y. Sept. 13, 2017) ....................................... 21, 22, 23, 24, 25, 26

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015) ................................................... 3

*Yakin v. Tyler Hill Corp.*,
   566 F.3d 72 (2d Cir. 2009) ............................................................. 19

*YWCA of the U.S. v. HMC Entm't*,
   No. 91 Civ. 7943 (KMW), 1992 WL 279361 (S.D.N.Y. Sept. 23, 1992) ......................... 29

STATUTES & RULES

9 U.S.C. § 1 *et seq.* ................................................................... 2, 30

9 U.S.C. § 2 ............................................................................ 10

Fed. R. Civ. P. 12(b)(2) ................................................................ 1

Fed. R. Civ. P. 12(b)(6) ................................................................ 1

Fed. R. Civ. P. 44.1 .................................................................... 2

OTHER AUTHORITIES

*BASIC Details: Alpari US LLC*, NFA
    https://www.nfa.futures.org/basicnet/Details.aspx?entityid=ISBX1mhBYJ0%3d&rn=Y
    (last visited Dec. 4, 2017) ................................................................................ 3

*BASIC Details: BNP Paribas SA*, NFA,
    https://www.nfa.futures.org/basicnet/Details.aspx?entityid=VqDjQ5X9nvA%3d&rn=N
    (last visited Dec. 4, 2017) ................................................................................ 4

*BASIC Details: Credit Suisse International*, NFA,
    https://www.nfa.futures.org/basicnet/Details.aspx?entityid=Atpozt HSeX4%3d&rn=Y
    (last visited Dec. 4, 2017) ................................................................................ 4

*BASIC Details: Credit Suisse Securities USA LLC*, NFA,
    https://www.nfa.futures.org/basicnet/ Details.aspx?entityid=oMwvJtkNrTM%3d&rn=Y
    (last visited Dec. 4, 2017) ................................................................................ 4

*BASIC Details: RBS Securities Inc.*, NFA,
    https://www.nfa.futures.org/basicnet/Details.aspx?entityid=bC8S0%2b6BJSk%3d&rn=Y
    (last visited Dec. 4, 2017) ................................................................................ 4

*BASIC Details: The Royal Bank of Scotland Plc*, NFA,
    https://www.nfa.futures.org/BasicNet/Details.aspx?entityid=Gt26uPc3RPI%3D
    (last visited Dec. 4, 2017) ................................................................................ 4

*Member Arbitration*, NFA,
    https://www.nfa.futures.org/arbitration/member-arbitration/index.html
    (last visited Dec. 4, 2017) ................................................................................ 4

National Futures Association: Firm Application,
    https://www.nfa.futures.org/registration-membership/templates-and-forms/Form7-R-
    entire.pdf ........................................................................................................ 4

NFA Member Arbitration Rules, Section 1(j) .......................................................... 3, 11

NFA Member Arbitration Rules, Section 2 .................................................................. 3

NFA Member Arbitration Rules, Section 2(a) ....................................................... 1, 4-5, 11

NFA Member Arbitration Rules, Section 4 .................................................................. 4

NFA Member Arbitration Rules, Section 5 .................................................................. 4

NFA Member Arbitration Rules, Section 17 ................................................................ 11

PAGE(S)

Registration Rules, Rule 101(t), NFA,
    https://www.nfa.futures.org/rulebook/rules.aspx?Section=8/ (last visited Dec. 4, 2017) ....... 4

*What We Do*, NFA,
    https://www.nfa.futures.org/about/index.html (last visited Dec. 4, 2017) ............................ 3

*Who We Are*, NFA,
    https://www.nfa.futures.org/about/index.html (last visited Dec. 4, 2017) ............................ 3

Defendants BNP Paribas ("BNPP")[1]; Credit Suisse Group AG, Credit Suisse AG, and

Credit Suisse Securities (USA) LLC (together, "Credit Suisse"); and The Royal Bank of

Scotland Group plc and RBS Securities Inc. (together with The Royal Bank of Scotland plc,

"RBS")[2] respectfully submit this joint memorandum of law in support of their motion to compel

arbitration or, in the alternative, to dismiss the Amended Complaints on the grounds of *forum*

*non conveniens*.[3]

## PRELIMINARY STATEMENT

Plaintiff Alpari (US) LLC ("Alpari") undertook to amend its complaint in response to

Defendants' assertion that its claims are subject to mandatory arbitration and forum selection

agreements.  However, Alpari does not and cannot plead around the agreements and dispute

resolution rules to which it is bound.  Under the plain language of those agreements and rules,

Alpari cannot litigate its claims in this Court.

First, Alpari is a member of the National Futures Association ("NFA").  As a member, it

is bound by the NFA Member Arbitration Rules.  Under those rules, the dispute between Alpari

and Defendants, which are also NFA members (or principals of members), "shall be arbitrated."[4]

---

[1] Although BNPP is referred to as "BNP Paribas, S.A." in the Amended Complaint against it, its legal name is simply BNP Paribas.

[2] The Royal Bank of Scotland plc ("RBS plc") is a wholly owned subsidiary of Defendant The Royal Bank of Scotland Group plc and the 100% indirect parent of Defendant RBS Securities Inc.  RBS plc is the RBS entity that is an FX dealer, and which entered into the agreements described herein.

[3] Briefing in these matters has been bifurcated to address threshold motions to enforce arbitration or forum selection clauses prior to any briefing of Rule 12(b)(6) or 12(b)(2) motions.  Civil Case Management Plan and Scheduling Order, *Alpari (US), LLC v. BNP Paribas, S.A.*, No. 17-cv-5278, Sept. 12, 2017, ECF No. 29, *Alpari (US), LLC v. Credit Suisse Group AG et al*, No. 17-cv-5282, ECF No. 38, *Alpari (US), LLC v. Royal Bank of Scotland Group plc et al*, 17-cv-5284, ECF No. 31; Memo Endorsed Joint Letter regarding Briefing Schedule, So-Ordered Nov. 3, 2017, *Alpari (US), LLC v. BNP Paribas, S.A.*, No. 17-cv-5278 ECF No. 34, *Alpari (US), LLC v. Credit Suisse Group AG et al*, No. 17-cv-5282, ECF No. 43, *Alpari (US), LLC v. Royal Bank of Scotland Group plc et al*, 17-cv-5284, ECF No. 36.  Defendants reserve any additional bases for dismissal, including with respect to personal jurisdiction, for subsequent motions in the event the Court denies the instant motion.

[4] NFA Member Arbitration Rules, Section 2(a) (2002), https://www.nfa.futures.org/rulebook/rules.aspx? Section=6.

Accordingly, this Court should compel arbitration of the claims in the Amended Complaints pursuant to Sections 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*

Second, even if the NFA Rules did not mandate arbitration, Alpari would be precluded by contract from prosecuting its claims in this Court.  Alpari's dealings with the Defendants were pursuant to written agreements, including Pricing and Liquidity Agreements and prime brokerage agreements, that govern the resolution of disputes.  Although the terms of the agreements with each Defendant differ in certain respects, a common thread is that they require Alpari to resolve its claims in arbitration or the courts of England.[5]  *See infra* Argument, Sections I.C and II.  Alpari's transparent attempts to plead around those agreements in its Amended Complaints are unavailing.

In sum, the Court should compel Alpari to arbitrate its claims.  In the alternative, the Court should dismiss the Amended Complaints on grounds of *forum non conveniens*.

## BACKGROUND

**A.**     **Alpari's and the Class Members' Claims**

Alpari, a now-defunct company, asserts claims for breach of implied contract and unjust enrichment on behalf of a putative class of participants in the foreign exchange ("FX") market, which it asserts were harmed by Defendants' alleged use of a practice called "Last Look."  Am. Compl. ¶¶ 1, 99-110, No. 17-cv-5278, Oct. 19, 2017, ECF No. 32 ("BNPP Am. Compl."); Am. Compl. ¶¶ 1, 97-108, No. 17-cv-5282, Oct. 19, 2017, ECF No. 41 ("Credit Suisse Am. Compl."); Am. Compl. ¶¶ 1, 97-108, No. 17-cv-5284, October 19, 2017, ECF No. 34 ("RBS Am. Compl.") (together, "Am. Compls.").  According to the Amended Complaints, liquidity providers, including Defendants, "delayed the execution of matched trades" and declined to execute the

---

[5] Pursuant to Federal Rule of Civil Procedure 44.1, Defendants hereby give notice that they intend to raise issues of English law.

transactions if, "by the end of [the Last Look] hold period," the mid-price had moved beyond a predetermined threshold.  Am. Compls. ¶¶ 4-5, 47-61.  Alpari purports to bring claims on behalf of itself and all persons placing orders on third-party electronic communication networks ("ECNs") that were matched to a Defendant's streaming price and either rejected by the Defendant or filled at a price less favorable than the original matched price.  Credit Suisse and RBS Am. Compls. ¶ 89; BNPP Am. Compl. ¶ 91.

## B.    <u>The NFA's Mandatory Arbitration Program</u>

The NFA is a self-regulatory organization, granted authority by the Commodity Futures Trading Commission to oversee and regulate the integrity of the derivatives market.[6]  Firms that conduct business in the derivatives industry, such as Alpari and Defendants, are required to register with the NFA as NFA members.[7]

### 1.    *NFA Members*

Alpari was a registered member[8] of the NFA from November 14, 2007 to April 21, 2015.[9]  BNP Paribas, Credit Suisse Securities (USA) LLC, RBS Securities Inc., and RBS plc are

---

[6] *Who We Are*, NFA, https://www.nfa.futures.org/about/index.html (last visited Dec. 4, 2017).

[7] *What We Do*, NFA, https://www.nfa.futures.org/ about/index.html (last visited Dec. 4, 2017).

[8] Under the NFA Member Arbitration Rules, "Member" is defined as "a Member of NFA other than a contract market or a person that was a Member (other than a contract market) at the time the acts or transactions that are the subject of the dispute occurred."  NFA Member Arbitration Rules, Section 1(j) (2007), https://www.nfa.futures.org/rulebook/rules.aspx?Section=8/ (last visited Dec. 4, 2017).

[9] *See BASIC Details: Alpari US LLC*, NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=ISBX1mh BYJ0%3d&rn=Y (last visited Dec. 4, 2017).  The Court may take judicial notice of public records maintained by the NFA.  *See, e.g., Wells Fargo Bank, N.A. v. Wrights Mill Holdings*, LLC, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); *Forgione v. Gaglio*, No. 13 CIV. 9061 KPF, 2015 WL 718270, at *17 (S.D.N.Y. Feb. 13, 2015) (taking judicial notice of publicly available document maintained online by FINRA); *Ikon Global Markets, Inc. v. CFTC*,  859 F. Supp. 2d 162, 165 & n. 1 (D.D.C. 2012) (taking judicial notice of NFA manual "as a matter of general public record").

registered NFA members.[10]  Corporate parents Credit Suisse AG, Credit Suisse Group AG, and

The Royal Bank of Scotland Group plc are principals[11] of certain NFA member subsidiaries.[12]

      2.    *NFA Member Arbitration Rules*

      Upon admission to NFA membership, "the applicant and its employees shall become and

remain bound by all NFA requirements, including without limitation . . . [the] Code of

Arbitration and Member Arbitration Rules . . . ."[13]  Under the NFA's Program for Member

Arbitration, "[i]f you are an NFA Member and your dispute involves another NFA Member, with

certain exceptions, *you are required to* file your claim at NFA."[14]

      Section 2 of the NFA rules provides for the mandatory arbitration of disputes between

and among NFA members, with limited exceptions.  Specifically:

> Except as provided in Sections 4 and 5 of these Rules with respect to timeliness
> requirements, disputes between and among Members ***shall be arbitrated under
> these Rules*** unless:
>
> (1) the parties, by valid and binding agreement, have committed themselves to the
> resolution of such dispute in a forum other than NFA; (2) the parties to such
> dispute are all required by the rules of another self-regulatory organization to
> submit the controversy to the settlement procedures of that self-regulatory
> organization; (3) all parties to the dispute are members of a contract market which

---

[10] *BASIC Details: BNP Paribas SA*, NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=VqDjQ5X9
nvA%3d&rn=N (last visited Dec. 4, 2017); *BASIC Details: Credit Suisse Securities USA LLC*, NFA, https://www.
nfa.futures.org/basicnet/Details.aspx?entityid=oMwvJtkNrTM%3d&rn=Y (last visited Dec. 4, 2017); *BASIC
Details: RBS Securities Inc.*, NFA,
https://www.nfa.futures.org/basicnet/Details.aspx?entityid=bC8S0%2b6BJSk%3d&rn=Y (last visited Dec. 4, 2017);
*BASIC Details: Royal Bank of Scotland plc The*, NFA,
https://www.nfa.futures.org/basicnet/Details.aspx?entityid=Gt26uPc3RPI%3d&rn=Y (last visited Dec. 4, 2017).

[11] Under NFA's Registration Rules, a "Principal" includes "with respect to an applicant, a registrant, or a person
required to be registered under the Act . . . an entity that: is  . . . the direct owner of 10% or more of  the outstanding
shares of any class of an applicant or registrant's equity securities, other than non-voting securities . . . ."  NFA
Registration Rules, Rule 101(t) (2017), https://www.nfa.futures.org/rulebook/rules.aspx?Section=8/.

[12] *BASIC Details: Credit Suisse International*, NFA, https://www.nfa.futures.org/basicnet/Details.aspx?entityid=
AtpoztHSeX4%3d&rn=Y (last visited Dec. 4, 2017); *BASIC Details: Royal Bank of Scotland plc The*, NFA
https://www.nfa.futures.org/BasicNet/Details.aspx?entityid=Gt26uPc3RPI%3D (last visited Dec. 4, 2017).

[13] *See National Futures Association: Firm Application*, NFA, at 41, https://www.nfa.futures.org/registration-
membership/templates-and-forms/Form7-R-entire.pdf (last visited Dec. 4, 2017).

[14] *Member Arbitration*, NFA, https://www.nfa.futures.org/arbitration/member-arbitration/index.html (last visited
Dec. 4, 2017) (emphasis added).

has jurisdiction over the dispute; or (4) one of the parties to the dispute is a party to a dispute pending in another forum and files a cross-claim or third-party claim in that forum. The cross-claim or third-party claim must arise out of an act or transaction that is the subject of the claim pending in that forum.[15]

C.    **Alpari's Electronic Platform and the Pricing and Liquidity Agreements**

In an attempt to plead around arbitration and forum selection clauses contained in agreements entered into with Defendants, Alpari now seeks to distinguish between two sets of trades.  First, Alpari alleges that from 2011 to 2015, it operated QuantumFX, an ECN for its institutional clients (its so-called "A-Book").  Am. Compls. ¶ 11.  Defendants provided liquidity to QuantumFX pursuant to Pricing and Liquidity Agreements entered into between Alpari and each Defendant.  *Id.*  According to Alpari, it did not hold funds of its clients on QuantumFX, and once its client entered into a trade through QuantumFX, Alpari would immediately enter into offsetting transactions in its own name with Defendants or another liquidity provider.  *Id.*  Alpari alleges that it does not advance claims based on its A-Book business.  *Id.* ¶ 13.  Nevertheless, the entities that engaged in trading on QuantumFX fall within the putative class definition set forth in the Amended Complaints (which includes persons who, *inter alia*, "placed an order on a third party ECN").  Credit Suisse and RBS Am. Compls. ¶ 89; BNPP Am. Compl. ¶ 91.

Separately, Alpari alleges that from 2010 to 2013, it also operated a so-called "B-Book" business for its non-institutional, retail clients.  Am. Compls. ¶ 12.   Unlike in its A-Book business, Alpari held funds for its B-Book clients and executed its own independent FX transactions with Defendants and other liquidity providers to manage its risk position.  *Id.*  Alpari alleges that its claims are "limited to FX transactions with [Defendants] as part of managing its B-Book business."  *Id.* ¶ 13.  Unlike in its original Complaints, Alpari now asserts that all of the trades on which its individual claims are based occurred over Currenex, a third-party ECN

---

[15] NFA Member Arbitration Rules, Section 2(a) (emphasis added).

(rather than over Defendants' proprietary trading platforms).  *Compare* Compls. ¶¶ 3-4 *with* Am.

Compls. ¶¶ 3-4, 14.

In 2011, Alpari entered into an Agreement for the Provision of Pricing and Liquidity (a

"Pricing and Liquidity Agreement") with Credit Suisse and a nearly identical Pricing and

Liquidity Agreement with RBS.  Januszewski Decl. Ex. 1; Cohen Decl. Ex. 1.[16]  These

agreements set forth several key terms relating to the electronic-FX ("eFX") trading relationship

between the parties, and to Credit Suisse's and RBS's roles as Liquidity Providers in streaming

prices, including:

- Credit Suisse ¶ 2.1.3, RBS ¶ 2.1.4: "Liquidity Provider shall stream or otherwise make available through the Trading Platform pricing and liquidity information for the purpose of Derivatives Trading";

- Credit Suisse ¶ 2.1.4, RBS ¶ 2.1.5: "Liquidity Provider shall use commercially reasonable efforts to stream such pricing and liquidity information continuously during normal trading hours"; and

- Credit Suisse ¶ 3.2.1, RBS ¶ 3.2.1: "Alpari agrees that Liquidity Provider makes no warranties that Quotes and Liquidity will be available continuously on the Trading Platform."

Januszewski Decl. Ex. 1; Cohen Decl. Ex. 1.

The Credit Suisse and RBS Pricing and Liquidity Agreements contain broad arbitration

clauses under which all disputes between the parties, including disputes "relating to" the

agreements, are subject to arbitration at the option of either party.  The arbitration clauses in each

Pricing and Liquidity Agreement provide:

> With respect to any suit, action or proceeding ("Proceeding") relating to this Agreement, each Party irrevocably: (a) submits to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan. . . .  Alternatively, **at the option of either Alpari or Liquidity Provider**, any Proceeding hereunder may be submitted for arbitration before: (a) the American Arbitration Association

---

[16] Defendants are permitted to rely on declarations and documents outside the Amended Complaint to support their motion to compel arbitration or, in the alternative, to dismiss on the grounds of *forum non conveniens.  See infra* Argument, Section I.A.

at its New York Office; or (b) the NFA at its New York Office and conducted according to the rules then in effect of the NFA.

Januszewski Decl. Ex. 1 ¶ 11.9; Cohen Decl. Ex. 1 ¶ 10.9 (emphasis added).[17]

Like RBS and Credit Suisse, in 2011, Alpari and BNPP entered into a Pricing and Liquidity Agreement, under which BNPP agreed to provide liquidity and pricing to Alpari's QuantumFX platform for its institutional clients.  Hall Decl. Ex. 1.  Alpari and BNPP explicitly agreed that BNPP "shall not be under any obligation to process, respond to, enter into or accept any Trade Request or Covering Transaction and *may in its sole discretion accept or reject any offer or proposal so made in whole or in part*."  *Id.* § 2.2.5 (emphasis added).  The BNPP Pricing and Liquidity Agreement also contains a forum selection clause that designates the courts of England as the sole proper forum to adjudicate any proceeding arising out of or in connection with that Agreement and further provides that the laws of England and Wales will govern any such proceeding.  *Id.*

**D.**      **The Prime Brokerage Agreements**

Alpari traded with Defendants only by way of, and on behalf of, its prime broker, Morgan Stanley.  *See* Am. Compls. ¶ 14.  Although Alpari asserts that its prime brokerage agreement with Morgan Stanley[18] "did not govern the specific matching and execution of transactions," (*id.*), the prime brokerage arrangement—consisting of several relevant agreements among Alpari, each Defendant, and Morgan Stanley—was fundamental to Alpari's ability to trade with Defendants.

---

[17] RBS and Alpari and Credit Suisse and Alpari also each had a related "Platform Agreement," which contains a similar arbitration clause.  *See* Platform Agreement between RBS and Alpari, dated April 4, 2011, ¶ 11.9 at Cohen Decl. Ex. 2; Platform Agreement between Credit Suisse and Alpari, dated February 16, 2011, ¶ 11.9 at Januszewski Decl. Ex. 6.  According to its terms, the Platform Agreements facilitated transactions on the QuantumFX platform by Alpari's clients who were also clients of RBS's or Credit Suisse's prime brokerage business.  Januszewski Decl. Ex. 6 ¶ 2.1; Cohen Decl. Ex. 2 ¶ 2.1.

[18] The prime brokerage arrangement between Alpari and Morgan Stanley is set forth in an agreement dated May 27, 2010 (the "Alpari-MS ISDA").  *See* Januszewski Decl. Ex. 2.

In addition to Plaintiff's agreement with Morgan Stanley, Defendants and Morgan Stanley entered into Master FX Give-Up agreements as part of the prime brokerage arrangement. Pursuant to the Master FX Give-Up agreements, "Prime Broker [Morgan Stanley] . . . authorized each party designated as a [Customer/Designated Party] in a Notice to enter into [Customer Transactions/foreign exchange transactions] *on its behalf* with [each Defendant]" (emphasis added) and that such transactions would be "given up" to Morgan Stanley, which would step in to face each of the counterparties.[19]  The "FX Give-Up Notices" established Alpari as the designated party to the respective Master Give-Up agreements and set out the specific parameters of the permitted transactions.[20]  Rounding out the suite of written agreements are an underlying ISDA agreement between Morgan Stanley and each Defendant[21] and (in the case of RBS and BNPP) a side letter under which Alpari agreed, *inter alia*, to a procedure for unwinding transactions that were rejected by the prime broker.[22]

---

[19] *See* Master FX Give-Up Agreement between RBS and Morgan Stanley, dated April 23, 2004, ¶¶ 2(a), 4 ("RBS-MS Master Give-Up"), at Cohen Decl. Ex. 3, subsequently amended on March 6, 2008 at Cohen Decl. Ex. 4; Master FX Give-Up Agreement between Credit Suisse and Morgan Stanley dated August 1, 2011, ¶ 2 ("Credit Suisse-MS Master Give-Up"), at Januszewski Decl. Ex. 3; Master FX Give-Up Agreement between BNP Paribas and Morgan Stanley, dated November 17, 2004, ¶2(a), at Hall Decl. Ex. 2 (emphasis added).

[20] *See* FX Give-Up Notice between RBS and Morgan Stanley, dated May 14, 2012, ("RBS Give-Up Notice"), at Cohen Decl. Ex. 5, subsequently amended on February 27, 2013, at Cohen Decl. Ex. 6; FX Give-Up Notice between Credit Suisse and Morgan Stanley, dated June 14, 2010 and subsequently amended on July 19, 2010, October 14, 2010, January 20, 2011, July 7, 2011, October 17, 2011, and October 19, 2011 ("Credit Suisse Give-Up Notice) at Januszewski Decl. Ex. 4; FX Give-Up Agreement Notice between BNPP and Morgan Stanley, dated July 19, 2010 and subsequently amended on September 28, 2010, January 20, 2011, May 4, 2011, May 24, 2010, July 7, 2011, August 18, 2011, October 19, 2011, March 14, 2012, May 11, 2012, August 28, 2012, and November 21, 2012  at Hall Decl. Ex. 3.

[21] S*ee* ISDA Agreement between RBS and Morgan Stanley, dated June 6, 2005 ("RBS-MS ISDA"), at Cohen Decl. Ex. 8, subsequently amended on July 12, 2011, at Cohen Decl. Ex. 9, and again on September 1, 2016, at Cohen Decl. Ex. 10; ISDA Agreement between Credit Suisse and Morgan Stanley, dated May 24, 2011 ("Credit Suisse-MS ISDA") at Januszewski Decl. Ex. 5; ISDA Agreement between BNP Paribas and Morgan Stanley, dated November 27, 2007, at Hall Decl. Ex. 4.

[22] *See* Side Letter between RBS and Alpari, dated May 16, 2012 ("RBS Side Letter") at Cohen Decl. Ex. 11; Agreement for the Treatment of Rejected Give-Up Transactions between BNP Paribas and Alpari, dated July 21, 2010 at Hall Decl. Ex. 5.

The Alpari-MS ISDA, RBS-MS Master Give-Up Agreement, and the Credit Suisse-MS

Master Give-Up Agreement each contain a forum selection clause providing for the exclusive

jurisdiction of the courts of England.  The Master Give-Up Agreement for RBS provides:

> This Give-Up Agreement shall be governed by, and construed in accordance with, the laws of England.  ***With respect to any Proceedings, each party irrevocably (i) submits to the exclusive jurisdiction of the courts of England*** and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party.

Cohen Decl. Ex. 3 ¶ 8(e) (emphasis added).  The Credit Suisse-MS Master Give-Up is

substantially similar.[23]  Under the Definitions, "'Proceedings' means any suit, action or other

proceedings **relating to** this [Give-Up] Agreement."  Cohen Decl. Ex. 3 ¶ 1; Januszewski Decl.

Ex. 3 ¶ 1 (emphasis added).

Similarly, the Alpari-MS ISDA provides:

> With respect to any suit, action or proceedings relating to any dispute, whether contractual or non-contractual, arising out of or in connection with this Agreement, ("Proceedings"), ***each party: (1) irrevocably submits to the exclusive jurisdiction of the English courts***; and (2) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Januszewski Decl. Ex. 2 Schedule, Part 4(h)(b) (emphasis added).

---

[23] The Credit-Suisse-MS Master Give-Up Agreement provides that "[t]his Agreement and all matters arising out of or in connection with it shall be governed by, and construed in accordance with English law without giving effect to conflict of laws provisions.  With respect to any Proceedings, each party irrevocably (i) submits to the exclusive jurisdiction of the courts of England and Wales and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party."  Januszewski Decl. Ex. 3 at ¶ 9(d).

## ARGUMENT

### I.

### ALPARI'S CLAIMS ARE SUBJECT TO MANDATORY ARBITRATION

#### A.      Standard of Review

In considering this motion to compel arbitration, the Court must bear in mind the "strong federal policy favoring arbitration." *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration" and "[a]rbitration clauses are to be construed as broadly as possible." *Citigroup Glob. Mkts. Inc. v. Preis*, No. 14 Civ. 08487 (LGS), 2015 WL 1782135, at *3 (S.D.N.Y. April 14, 2015) (Schofield, J.) (internal citation omitted).

Section 2 of the Federal Arbitration Act provides that a written agreement to arbitrate "in any . . . contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable . . . ."  9 U.S.C. § 2.  This is "a congressional declaration of a liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983), the "principal purpose" of which is to "ensure that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (citation omitted).  In light of the "bias in favor of arbitration," the Court need only consider two threshold issues on this motion to compel arbitration: "(1) whether the parties agreed to arbitrate, and if so, (2) whether the scope of that agreement encompasses the asserted claims." *Chelsea Square Textiles v. Bombay Dyeing & Mfg. Co*, 189 F.3d 289, 294 (2d. Cir. 1999).  Courts construe "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *McMahan Sec. Co. L.P. v. Forum Capital Markets L.P.*, 35 F.3d 82, 86 (2d Cir. 1994) (alteration in original) (citation omitted).

10

In deciding a motion to compel arbitration (or a motion to dismiss on the grounds of *forum non conveniens*), the court may consider declarations and documents that are not referenced in the Amended Complaints. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (A court deciding a motion to compel arbitration may consider "'all relevant, admissible evidence submitted by the parties.'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)); *Martinez v. Bloomberg LP*, 740 F.3d 211, 216-17 (2d Cir. 2014) (A court deciding a motion to enforce a forum selection clause "typically relies on the pleadings and affidavits.").[24]

## B.    Alpari's Claims Are Subject To Mandatory NFA Arbitration

A motion to compel arbitration based on the rules of a self-regulatory organization, such as the NFA, is subject to the same overarching principles that are applied in cases involving counterparties' bilateral agreements to arbitrate with each other. *McMahan*, 35 F.3d at 86. Courts examine a self-regulatory organization's arbitration rules "as a matter of contract interpretation" under New York law and thus interpret a provision "to give effect to the parties' intent as expressed by the plain language of the provision." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 176 (2d Cir. 2003) (citation omitted); *see also ProShares Tr. v. Schnall*, 695 F. Supp. 2d 76, 78-79 (S.D.N.Y. 2010).

Here, Alpari's claims are subject to mandatory NFA arbitration. Section 2(a) of the NFA Member Arbitration Rules unambiguously provides that "disputes between and among Members *shall be arbitrated* under these rules," subject only to timeliness requirements and certain limited

---

[24] The applicability of any of the exceptions to NFA arbitrability turns on the interpretation of the NFA Rules, which is committed by the rules to the judgment of the NFA. *See* NFA Member Arbitration Rules, Section 17 ("NFA has the authority to interpret the provisions of these Rules."). Accordingly, the applicability of the exceptions should be decided in the course of the NFA arbitration. See *Alliance Bernstein v. Schaffran*, 445 F.3d 121, 127 (2d Cir. 2006) (NASD Code "clearly and unmistakably evince[d] the parties' intent to submit to arbitration disputes over arbitrability that turn on interpretations of provisions of the Code.").

exceptions (emphasis added).  All parties in this case are NFA members or principals.  *See supra* Background, Section B.1.  Alpari was registered with the NFA "at the time the acts or transactions that are subject of the dispute occurred," and therefore falls within the definition of a member as set forth in the NFA Rules.  *See* NFA Member Arbitration Rules, Section 1(j); *see* Am. Compls. ¶¶ 11-12.  Accordingly, because this is a dispute between NFA members, it is subject to mandatory arbitration.

C.     **Alpari Separately Agreed To Arbitrate Claims Against Credit Suisse and RBS**

As described *supra* Background, Section C, Alpari has also entered into separate Liquidity and Pricing Agreements with Credit Suisse and RBS that permit either party to submit claims to arbitration rather than litigation.  Accordingly, even if the Court concludes that the NFA Member Arbitration Rules do not apply (*supra* Argument, Section I.B.), the motion to compel arbitration of claims against Credit Suisse and RBS should be granted under the plain language of the Liquidity and Pricing Agreements.

     1.     *Alpari's Claims Fall Within the Scope of the Agreements To Arbitrate with Credit Suisse and RBS*

In determining whether an agreement's arbitration clause covers a particular claim or dispute, the court must first decide whether the arbitration clause at issue is "broad" or "narrow." *Louis Dreyfus Negoce v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d. Cir 2001) ("First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow.").

The arbitration provision in the Pricing and Liquidity Agreements – covering "any . . . Proceeding relating to this Agreement" – is a "broad" clause, as it allows either party to submit to arbitration "any suit, action, or proceeding . . . relating to this Agreement."  *See Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) ("[a]ny claim or controversy

arising out of or relating to th[e] agreement" is "the paradigm of a broad clause" (alteration in original) (citation omitted)); *Consol. Rail Corp. v. Metro. Transp. Auth.*, No. 95 Civ 2142 (LAP), 1996 WL 137587, at *1 (S.D.N.Y. Mar. 22, 1996) ("Each Service Agreement contained a broadly worded arbitration clause, referring to arbitration '[a]ny claim or controversy . . . relating to the meaning of this Agreement or any provision hereof or relating to an alleged breach hereof.'" (alteration in original)).

   "Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'" *Louis Dreyfus Negoce*, 252 F.3d at 224 (quoting *Collins*, 58 F.3d at 23).  In other words, because the parties here agreed to a broad arbitration provision, the provision is "presumptively applicable to disputes involving matters going beyond the interpretation or enforcement of particular provisions of the contract." *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004) (citation, internal quotation marks, and alterations omitted); *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 27 (2d Cir. 1995) ("[W]hen the contract's arbitration clause is a broad one, 'the strong presumption in favor of arbitrability applies with even greater force.'" (citation omitted)).  So long as the issues in the complaint "'touch matters' within the . . . agreement," the dispute must be arbitrated.  *Louis Dreyfus Negoce*, 252 F.3d at 225; *see also Popper v. Monroe*, 673 F. Supp. 1228, 1230 (S.D.N.Y. 1987) (finding that if the dispute relates to the parties' agreement or is integrally linked to the agreement, the court must compel arbitration).

   Here, the eFX trading relationships between Alpari and Credit Suisse or RBS at issue in the Pricing and Liquidity Agreements are fundamental to the parties' trading relationship and to the claims Alpari asserts.  Alpari's allegations of breach of implied contractual duties focus on

Credit Suisse's and RBS's obligations to counterparties, including Alpari, as liquidity providers. *See* Am. Compls. ¶¶ 3-6. The Pricing and Liquidity Agreements on their face relate to conduct by Credit Suisse and RBS as Liquidity Providers over an ECN. Januszewski Decl. Ex. 1; Cohen Decl. Ex. 1 ("[P]ursuant to [the Agreements] one or more liquidity providers, including [Credit Suisse/RBS], shall stream executable pricing into the Trading Platform pursuant to the terms and conditions herein."). In essence, these agreements relate to the eFX trading relationship between Alpari, on the one hand, and Credit Suisse or RBS, on the other hand.

Beyond the identity in subject matter between Alpari's claims and the Pricing and Liquidity Agreements, many of the specific provisions of those agreements bear directly on the issues in this case (Credit Suisse ¶ 2.1.3, RBS ¶ 2.1.4: "Liquidity Provider shall stream or otherwise make available through the Trading Platform pricing and liquidity information for the purpose of Derivatives Trading"; Credit Suisse ¶ 2.1.4, RBS ¶ 2.1.5: "Liquidity Provider shall use commercially reasonable efforts to stream such pricing and liquidity information continuously during normal trading hours"; and Credit Suisse ¶ 3.2.1, RBS ¶ 3.2.1: "Alpari agrees that Liquidity Provider makes no warranties that Quotes and Liquidity will be available continuously on the trading platform"). Januszewski Decl. Ex. 1; Cohen Decl. Ex. 1. As discussed *infra* Argument, Section I.C.2, Alpari cannot avoid the relevance of these terms by conveniently carving out its individual claims based on trading over one particular ECN (QuantumFX), while at the same time pursing such claims on behalf of a class of which it is a member.

With such overlap of issues between the allegations in the Amended Complaints and the parties' roles and obligations under the Pricing and Liquidity Agreements, Alpari's claims plainly relate to these agreements. At a minimum, the Court "cannot say with positive assurance

that the arbitration clauses at issue are not susceptible to an interpretation" that Alpari's claims

"touch matters" within the Pricing and Liquidity Agreements.  *In re Currency Conversion Fee*

*Antitrust Litig.*, 265 F. Supp. 2d 385, 406 (S.D.N.Y. 2003).  Arbitration is therefore required.

       2.    *Alpari's Attempt To Avoid Arbitration by Artful Pleading Is Unavailing*

In the Amended Complaints, Alpari attempts to plead around the broad arbitration

provisions of the Pricing and Liquidity Agreements by purporting to narrow the scope of its

claims to exclude certain FX trades with Defendants on Alpari's trading platform.  Alpari

suggests that its eFX trading can be divided into two distinct segments: its "A-Book" business,

under which Alpari's institutional clients used Alpari's QuantumFX platform to access pricing

provided by various liquidity providers and once its client entered into a trade through

QuantumFX, Alpari would immediately enter into offsetting transactions in its own name with

Defendants or another liquidity provider (Am Compls. ¶ 11); and its "B-Book" business, under

which Alpari managed its overall risk position relating to its retail client trading by entering into

trades with Defendant or another liquidity provider (*Id.* ¶¶ 12-14).  On the basis of this

distinction, Alpari seeks to avoid its agreements to arbitrate with Credit Suisse and RBS by

disclaiming the intention to pursue claims based on its institutional "A-Book" business over the

QuantumFX platform.  This attempt, however, must fail for at least three reasons.

*First*, Alpari's purported narrowing is irrelevant.  Under the broad arbitration provisions

of the Pricing and Liquidity Agreements, all matters "relating to" the agreements must still be

sent to arbitration.  Januszewski Decl. Ex. 1 at ¶ 11.9.1; Cohen Decl. Ex. 1 at ¶ 10.9.1.  "If the

allegations underlying the claims touch matters covered by the parties' contracts, then those

claims must be arbitrated."  *JLM Industries*, 387 F.3d at 172 (citation omitted); *see also In re*

*Currency Conversion Fee*, 265 F. Supp. 2d at 406.  In making this determination, the Court must

"focus on the factual allegations in the complaint rather than the legal causes of action asserted,"

15

*JLM Industries*, 387 F.3d at 173 (citation omitted), and must "not limit[] arbitration claims to those that constitute a breach of the terms of the contract at issue." *Mehler v. Terminix International Co.,* 205 F.3d 44, 50 (2d Cir. 2000).  Alpari alleges that Credit Suisse and RBS rejected trades over ECNs in violation of alleged implied contracts.  Alpari's allegations that Credit Suisse and RBS breached their implied contractual duties relate to the terms of the Pricing and Liquidity Agreements, which govern Credit Suisse's and RBS's conduct as Liquidity Providers over an ECN.  This dispute therefore "pertain[s] to" the eFX liquidity offerings Credit Suisse and RBS provided, including those provided under the Pricing and Liquidity Agreements. *Coudert v. Paine Webber Jackson & Curtis*, 705 F.2d 78, 82 (2d Cir. 1983); *see also Norcom Elecs. Corp. v. CIM USA Inc.,* 104 F. Supp. 2d 198, 204 (S.D.N.Y. 2000) (tortious interference claim arbitrable where it alleged conduct that "would be wrongful in respect of the subject matter of the" contract at issue).

  *Second*, attempts such as Alpari's to evade arbitration agreements through artful pleading are disfavored.  *See McCowan v. Sears, Roebuck and Co.*, 908 F.2d 1099, 1106 (2d Cir. 1990) (rejecting plaintiff's attempt to plead around an arbitration agreement and avoid a mandatory stay under the FAA by failing to seek relief against a party to the agreement); *Mosca v. Doctors Assocs.*, 852 F. Supp. 152, 155 (E.D.N.Y. 1993) ("This court will not permit Plaintiffs to avoid arbitration simply by naming individual agents of the party to the arbitration clause and suing them in their individual capacity.  To do so would be to subvert the federal policy favoring arbitration and the specific arbitration clause in the instant case."); *Smith v. Smith*, No. 3:14-CV-00707-ST, 2014 WL 5462023, at *7 (D. Or. Oct. 27, 2014) (rejecting plaintiff's "attempt to artfully plead around the arbitration clause" where the terms of the agreement were "inextricably intertwined" with her claims against the defendant and "touch[ed] matters covered" by the

agreement).  The Court should reject Alpari's attempt to circumvent the agreements to arbitrate it made with Credit Suisse and RBS.

*Third*, although Alpari alleges that it "does not advance claims based on its A-Book business" (Am. Compls. ¶ 13), the definition of the class Alpari purports to represent plainly includes such claims.  Both the Credit Suisse and RBS Amended Complaints provide that Alpari "brings this action on behalf of itself and . . . [a]ll persons in the United States who [during the Class Period] placed an order on a third party ECN that was matched to [Credit Suisse's/RBS's] streaming price and was either rejected by [Credit Suisse/RBS] or filled at a price less favorable than the original [Credit Suisse/RBS] price to which it was matched."  Credit Suisse and RBS Am. Compls. ¶ 89.  Alpari's A-Book trading was conducted through an ECN (that is, QuantumFX) (*id.* ¶ 11), and, to the extent the A-Book trading was subject to the use of "Last Look" by Credit Suisse and RBS, this would be trading "matched to [Credit Suisse's/RBS's] streaming price" that was later "rejected by [Credit Suisse/RBS] or filled at a price less favorable . . . ."  (*Id.* ¶ 89).  Traders in Alpari's "A-Book" are therefore included in the Class Definition, and Alpari's amended complaint allegations therefore encompass trading conducted pursuant to the Agreements for Pricing and Liquidity.

The strong federal policy in favor of arbitration requires the Court to resolve ambiguities in favor of arbitration, and Alpari's attempt to plead around the arbitration clauses (*see* Am. Compls. ¶¶ 11-13) cannot undermine the agreements to arbitrate.  Under the broad arbitration agreements Alpari signed with Credit Suisse and RBS, the Court must compel arbitration because "the allegations underlying the claims touch matters covered by the parties' contracts . . . ."  *JLM Industries*, 387 F.3d at 172; *see also Alfa Laval U.S. Treasury v. Nat'l Union Fire Ins. Co. of Pitt.*, 857 F. Supp. 2d 404, 413-14 (S.D.N.Y. 2012).  The parties have

agreed to arbitrate issues relating to Credit Suisse's and RBS's actions as liquidity providers for

FX transactions.  Alpari's claims arise from and relate to the use of such services, and therefore

the claims must be arbitrated.  Furthermore, even if the scope of the arbitration agreements were

ambiguous, which they are not, the FAA's policy favoring arbitration requires that "any

doubts . . . be resolved in favor of arbitration."  *Moses H. Cone*, 460 U.S. at 24-25.

## II.

## ALPARI'S CLAIMS SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS*

If the Court declines to compel arbitration, it should dismiss the Amended Complaints on

the grounds of *forum non conveniens* because agreements governing FX trading between Alpari

and the Defendants provide for exclusive jurisdiction in the courts of England.

### A.     Standard of Review

Federal policy favors the enforcement of forum selection clauses, even where, as here,

the chosen forum is a foreign forum.  *Martinez*, 740 F.3d at 219.  As the Supreme Court stated in

*Atlantic Marine*, "[w]hen parties have contracted in advance to litigate disputes in a particular

forum, courts should not unnecessarily disrupt the parties' settled expectations."  *Atl. Marine*

*Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 583 (2013).  "Courts,

including the Court of Appeals for the Second Circuit, have recognized that a party may not

maintain a suit in federal court when it has committed to litigate claims against its contract

counter-party in another jurisdiction, such as the courts of a particular state or foreign nation."

*Giordano v. UBS, AG*, 134 F. Supp. 3d 697, 701 (S.D.N.Y. 2015) (citing *Martinez*, 749 F.3d at

219).

The Supreme Court has held that the proper method to enforce a forum selection clause is through the doctrine of *forum non conveniens*. *Atl. Marine*, 134 S. Ct. at 580-81.[25]  Determining the scope of a forum selection clause is a matter of contractual interpretation, *see Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 76 (2d Cir. 2009), and "[t]he Second Circuit has endorsed an expansive reading of the scope of forum selection clauses, in keeping with the policy favoring their use." *Bluefire Wireless, Inc. v. Cloud9 Mobile Commc'ns, Ltd.*, No. 09-CV-7268, 2009 WL 4907060, at *3 (S.D.N.Y. Dec. 21, 2009) (citations omitted).  In deciding a motion to dismiss on the basis of a forum selection clause, the court "typically relies on pleadings and affidavits, but must conduct an evidentiary hearing to resolve disputed factual questions in favor of the defendant." *Martinez*, 740 F.3d at 216-17 (citation omitted); *Laspata DeCaro Studio Corp. v. Rimowa GmbH*, No. 16 Civ. 934 (LGS), 2017 WL 1906863, at *3 (S.D.N.Y. May 8, 2017) (Schofield, J.).

"[F]orum selection clauses are *prima facie* valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances," *TradeComet.com LLC v. Google*, *Inc.,* 647 F.3d 472, 475 (2d Cir. 2011) (quoting *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10 (1972)) (internal quotation marks omitted), or unless the forum selection clause "was invalid for such reasons as fraud or overreaching," *Bense v. Interstate Battery System of America, Inc.*, 683 F.2d 718, 721 (2d Cir. 1982) (citation omitted). In determining whether to enforce a forum selection clause, the court examines the following:

---

[25] As *forum non conveniens* is a "non-merits ground for dismissal," a court may "dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant."  *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007) (internal quotation marks omitted); *see also Magi XXI, Inc. v. Stato della Città del Vaticano*, 714 F.3d 714, 720 n.6 (2d Cir. 2013).  As considerations of convenience, fairness, and judicial economy weigh in favor of addressing the appropriate forum first, this motion should not be construed as a waiver of any affirmative defense, including lack of personal jurisdiction.

> (1) whether the clause was reasonably communicated to the party resisting
> enforcement; (2) whether the clause is mandatory or permissive, i.e., . . . whether
> the parties are required to bring any dispute to the designated forum or
> simply *permitted* to do so; and (3) whether the claims and parties involved in the
> suit are subject to the forum selection clause.

*Martinez*, 740 F.3d at 217  (alteration in original) (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d

378, 383 (2d Cir. 2007)) (internal quotation marks omitted).

"If the forum clause was communicated to the resisting party, has mandatory force and

covers the claims and parties involved in the dispute, it is presumptively enforceable."  *Id.*

(citation omitted).  The court then examines, (4) whether the resisting party has overcome this

presumption by "making a sufficiently strong showing that enforcement would be unreasonable

or unjust, or that the clause was invalid for such reasons as fraud or overreaching."  *Id.* (quoting

*Phillips*, 494 F.3d at 383-84).  In this modified *forum non conveniens* analysis, the "Plaintiff's

choice of forum 'merits no weight.'"  *Giordano*, 134 F. Supp. 3d at 703 (quoting *Atl. Marine*,

134 S. Ct. at 581).

**B.**      **Alpari's Claims Against BNPP Are Subject to Dismissal For *Forum Non Conveniens*
Based on the BNPP Pricing and Liquidity Agreement**

The class definition includes claims subject to the forum selection clause in the BNPP

Pricing and Liquidity Agreement, which requires litigation of disputes in the courts of England

and under the laws of England and Wales.  Understandably, Alpari has attempted to plead

around this agreement.  As set forth *supra* Background, Section C, Alpari purports to limit its

claims to only FX transactions that were undertaken with BNPP "as part of managing its B-Book

business," BNPP Am. Compl. ¶ 13, but Alpari's proposed class definition and claims for relief

are not so limited.  As QuantumFX is an ECN, all of the "A-Book" trading falls within the class

definition, and is governed by the BNPP Pricing and Liquidity Agreement.  Thus, despite its

transparent attempt at artful pleading, by filing this suit in this Court Alpari has contravened its

express agreement to adjudicate any disputes related to the BNPP Pricing and Liquidity Agreement in the courts of England and under the law of England and Wales, which was reasonably communicated to Alpari and covers the claims and parties involved in the suit.  The clause should therefore be enforced and Alpari's claims against BNPP dismissed.

    1.    *The Forum Selection Clause in the BNPP Pricing and Liquidity Agreement Was Reasonably Communicated to Alpari*

There is no question that the forum selection clause in the BNPP Pricing and Liquidity Agreement was reasonably communicated to Alpari.  The clause appears as part of a standard section within the main body of the BNPP Pricing and Liquidity Agreement, which was signed by Alpari's Chief Executive Officer, and is phrased in clear and unambiguous language.  *See Ujvari v. 1stdibs.com, Inc.*, No. 16 CIV. 2216 (PGG), 2017 WL 4082309, at *8 (S.D.N.Y. Sept. 13, 2017) (holding that a forum selection clause has been "reasonably communicated" to the party contesting it where "[t]he clause at issue  . . . appear[s] as a standard section in the main body of [an] [a]greement signed by [plaintiff] and is phrased in both clear and unambiguous language" (alteration in original) (citation omitted)).

    2.    *The Forum Selection Clause of the BNPP Pricing and Liquidity Agreement Is Mandatory*

The forum selection clause in the BNPP Pricing and Liquidity Agreement provides for both exclusive jurisdiction in England and the courts of England as the obligatory venue.  Each party has:

> irrevocably (i) submit[ed] to the exclusive jurisdiction of the English courts and (ii) waive[d] any right it may have to object that the English courts are not natural or appropriate forum for bringing proceedings in relation to this Agreement or that the English courts do not have jurisdiction in respect of such proceedings.

Hall Decl. Ex. 1 § 10.12.1.  By both conferring exclusive jurisdiction and incorporating clearly obligatory venue language, the forum selection clause in the BNPP Pricing and

Liquidity Agreement is mandatory in its application.  *See Ujvari*, 2017 WL 4082309, at *9 (concluding that a forum selection clause is mandatory where "(1) 'it confers exclusive jurisdiction on the designated forum' or (2) 'incorporates obligatory venue language'" (citation omitted)); *Laspata*, 2017 WL 1906863, at *5; *Phillips*, 494 F.3d at 386.

The forum selection clause is equally mandatory and exclusive under English law. *Martinez*, 740 F.3d at 217-18 ("In answering the *interpretive* questions posed by parts two and three of the four-part framework, however, we normally apply the body of law selected in an otherwise valid choice-of-law clause." (citation omitted).  Under English law, as under U.S. law, a clause that explicitly confers exclusive jurisdiction upon a particular forum is mandatory in nature.  *See Glob. Maritime Invs. Cyprus Ltd. v. O.W. Supply & Trading A/S* (under konkurs) ([2015] EWHC 2690 (Comm)) (attached as Appendix A).  Thus, under both U.S. and English law, Alpari's attempt to bring suit in this venue contravenes the mandatory forum selection clause it agreed to with BNPP.

3.    *The Claims at Issue and Parties to the BNPP Liquidity Agreement Are Subject to the Forum Selection Clause*

Under U.S. and English law, both the parties involved in the suit and the claims advanced by Alpari are subject to the forum selection clause contained in the BNPP Pricing and Liquidity Agreement.  *See Martinez*, 740 F.3d at 224 (indicating that because this step involves an "interpretive dispute," the court should "turn to the body of law selected by the contracting parties").  Under English law, "the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal."  *Id.* (quoting *Fili Shipping Co. Ltd. v. Premium Nafta Prods. Ltd.*, [2007]

UKHL 40, [13]) (known as *Fiona Trust*, attached as Appendix B).  "Although the *Fiona Trust*

case involved an arbitration clause, the decision refers broadly to the interpretation of

'jurisdiction clauses'" and "English courts have repeatedly applied the holding in the *Fiona Trust*

case to cases involving forum selection clauses."  *Id.* at 225 (citation omitted).  *Id.* at 225.  With

this in mind, English courts have consistently found that the "'proper approach to the

construction of clauses agreeing jurisdiction . . . is to construe them widely and generously.'"  *Id.*

at 225 (quoting *UBS AG v. HSH Nordbank AG*, [2009] EWCA (Civ) 585, [82]) (attached as

Appendix C); *Ujvari*, 2017 WL 4082309, at \*9.  In fact, in its decision in *Fili*, the English House

of Lords (now the U.K. Supreme Court) held "that courts should presume that [a forum

selection] clause encompasses all disputes involving the relationship into which the contracting

parties entered 'unless the language makes it clear that certain questions were intended to be

excluded from the [selected] jurisdiction.'"  *Martinez*, 740 F.3d at 224-25 (quoting *Fili Shipping*,

[2007] UKHL 40, [13]); *Ujvari*, 2017 WL 4082309, at \*9.  Importantly, the English Courts have

also held that "[t]he scope of a forum selection clause does not turn on 'whether an ingenious

pleader could frame a cause of action without actually mentioning the . . . Agreement.'"

*Martinez*, 740 F.3d at 227 (citation omitted).

The BNPP Pricing and Liquidity Agreement relates to BNPP's services as a liquidity

provider.  Hall Decl. Ex. 1 § 2.1.2.  Under the Agreement, BNPP agreed to stream pricing and

liquidity information for foreign exchange trading to Alpari's ECN.  In the Amended Complaint,

Alpari attempts to circumvent the forum selection clause by narrowing the scope of its own

claims.  However, Alpari still asserts a broad class definition and purports to sue on behalf of:

> All persons in the United States who [during the Class Period] placed an order on
> a third party ECN that was matched to BNP Paribas's streaming price and was
> either rejected by BNP Paribas or filled at a price less favorable than the original
> BNP Paribas price to which it was matched.

BNPP Am. Compl. ¶ 91.  This definition encompasses transactions that took place over Alpari's trading platform, including its own trades.

Despite Alpari's attempts to avoid the forum selection clause by artful pleading (*see id.* ¶¶ 11-13), the class definition and allegations of the Amended Complaint make clear that Alpari's lawsuit relates to trades subject to the forum selection clause in the BNPP Pricing and Liquidity Agreement.  Allowing Alpari to go forward with these claims would contradict the Second Circuit's established tradition of refusing to allow "a party's solemn promise to be defeated by artful pleading."  *Phillips*, 494 F.3d at 388 (quoting *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993)); *see also Ujvari*, 2017 WL 4082309, at *10.

**C.**     **Alpari's Claims Against Credit Suisse and RBS Are Subject to Dismissal For *Forum Non Conveniens* Based on the Prime Brokerage Agreements**

Even if the Court holds that the NFA Member Arbitration Rules and the Pricing and Liquidity Agreements – and the arbitration and forum selection clauses therein – are inapplicable to the claims as Plaintiff has purported to assert them in the Amended Complaint, the claims against Credit Suisse and RBS should be dismissed for *forum non conveniens*.[26]

As discussed *supra* Background, Section D, Alpari did not transact directly with Defendants.  Rather, Alpari traded with Defendants only by way of, and on behalf of, its prime broker, Morgan Stanley.  With respect to Credit Suisse and RBS, the prime brokerage arrangement was memorialized in written agreements, specifically the Alpari-MS ISDA and the RBS-MS and Credit Suisse-MS Master Give-Up Agreements, each of which contains English forum selection clauses.  *See supra* Background, Section D.  Alpari received reasonable notice of these clauses, which cover the parties and claims at issue.  Accordingly, the provision for English

---

[26] BNPP does not join in this argument and notes that the applicability of any contractual forum selection clause should be resolved by the NFA arbitrator.  *See supra* Argument, I.B.

jurisdiction is presumptively enforceable, necessitating dismissal on the grounds of *forum non conveniens*.[27]

    1.    *The Prime Brokerage Agreement Clauses Providing for England as the Exclusive Forum Were Reasonably Communicated to Alpari*

    The forum selection clauses in the Alpari-MS ISDA and the RBS-MS and Credit Suisse-MS Master Give-Up Agreements are "phrased in clear and unambiguous language." *Magi XXI, Inc. v. Stato Della Città Del Vaticano*, 818 F. Supp. 2d 597, 604-05 (E.D.N.Y. 2011), *aff'd*, 714 F.3d 714 (2d Cir. 2013).  Specifically, each party "irrevocably submits to the exclusive jurisdiction of the [English courts]," Januszewski Decl. Ex. 2 at Schedule, Part(h)(b); Cohen Decl. Ex. 3 ¶ 8(e); Januszewski Decl. Ex. 3 ¶ 9(d).  *See, e.g.*, *Ujvari*, 2017 WL 4082309, at *8 (finding that a forum clause was reasonably communicated where it stated that each party "irrevocably submits for all purposes in connection with this Agreement to the exclusive jurisdiction of the courts of England").

    In addition to having knowledge of its own ISDA agreement with Morgan Stanley (which contains an English forum provision), Alpari was also put on notice of the agreements between Morgan Stanley and each of Credit Suisse and RBS.  Each Master Give-Up Agreement

---

[27] The forum selection clauses in the RBS-MS ISDA and the RBS Side Letter provide for New York jurisdiction. These clauses are not applicable in this case.  With regard to the RBS-MS ISDA, the RBS-MS Master Give-Up Agreement provides that "[i]n the event of any inconsistency between the terms of this Give-Up Agreement and the Master [ISDA] Agreement . . . *this Give-Up Agreement shall prevail*." Cohen Decl. Ex. 3 ¶ 8(d) (emphasis added). As to the Side Letter, its forum selection clause is permissive, rather than mandatory:  "[T]he parties hereby submit to the jurisdiction of the courts of the State of New York with respect to any proceeding relating hereto, *although nothing stated here shall restrict the right of either party to take legal proceedings in any other court of competent jurisdiction*." Cohen Decl. Ex. 11 ¶ 5 (emphasis added).  By contrast, the English forum selection clauses in both the Alpari-MS ISDA and the RBS-MS Master Give-Up Agreement are mandatory, *see infra* Argument, Section II.C.2. Moreover, the claims at issue involve relief that is directly related to the Alpari-MS ISDA and the RBS-MS Give-Up Agreement and is unrelated to the subject matter of the Side Letter, which principally addresses the procedure for unwinding transactions not within the parameters of the prime brokerage relationship.  In such situations, the Court should enforce the mandatory English forum clauses in the agreements directly governing the subject matter at issue. *See Sabal Ltd. LP v. Deutsche Bank AG*, 209 F. Supp. 3d 907, 924 (W.D. Tex. 2016) (enforcing mandatory forum selection clause over permissive clause where the plaintiff's claims sought relief related to both agreements); *see also Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009) (describing that the court's analysis of a permissive forum selection clause is not subject to the same presumption of enforceability as a mandatory clause).

references a Give-Up Notice that copies Alpari and identifies Alpari as a "Designated Party" under the Master Give-Up Agreement and establishes Alpari's ability to place FX orders with Defendants on behalf of its prime broker.  The FX Give-Up Notices expressly provide that they are to be construed by the terms in the Master Give-Up Agreements.  *See* Cohen Decl. Ex. 5, at 1; Januszewski Decl. Ex. 4, at 1 (stating that certain terms of the Notice "shall have the meanings given to such terms in the [Master] Give-Up Agreement").

      2.    *The Prime Brokerage Agreement Clauses Are Mandatory*

Second, the language providing for English jurisdiction is mandatory.  A forum selection clause is mandatory where "(1) 'it confers exclusive jurisdiction on the designated forum' or (2) 'incorporates obligatory venue language.'"  *Ujvari*, 2017 WL 4082309, at *8 (quoting *Glob. Seafood Inc. v. Bantry Bay Mussels Ltd.*, 659 F.3d 221, 225 (2d Cir. 2011)); *see also supra* Argument, Section II.B.2.  The clauses in both the Alpari-MS ISDA and in the Master Give-Up Agreements meet the above criteria, providing that each party: "*irrevocably submits* to the *exclusive* jurisdiction of the courts of England" and "*waives any objection*" as to venue and inconvenient forum.  Januszewski Decl. Ex. 2 at Schedule, Part 4(h); Cohen Decl. Ex. 3 ¶ 8(e); Januszewski Decl. Ex. 3 ¶ 9(d) (emphases added).

      3.    *The Prime Brokerage Agreement Clauses Cover the Parties and Claims at Issue*

Third, the parties and claims asserted here, which relate to transactions undertaken pursuant to the prime brokerage arrangement, are subject to the forum selection clause in the Alpari-MS ISDA and the Master Give-Up Agreements.  *See* Cohen Decl. Ex. 3 ¶¶ 2(a), 4; Januszewski Decl. Ex. 3 ¶ 2; *see also supra* Background, Section D.

The prime brokerage arrangement is documented in complementary agreements between Alpari and Morgan Stanley, on the one hand, and Morgan Stanley and RBS and Credit Suisse, on the other.  The agreements fit together as necessary parts of the transactions on which Alpari's

claims in this case are based.  In those circumstances, Credit Suisse and RBS may invoke the

clause against Alpari because the relationship among the parties to the agreements is

"sufficiently close that the non-signatory's enforcement of the forum selection clause is

'foreseeable' to the signatory against whom the non-signatory wishes to enforce the forum

selection clause."  *See Magi XXI*, 714 F.3d at 723.  A relationship is sufficiently close where,

among other considerations, the non-signatories' interest in the litigation are "'directly related to,

if not predicated upon' those of the signatories."  *Aguas Lenders*, 585 F.3d at 701 (collecting

cases) (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir.

1998)).[28]

　　　　Here, the Alpari-MS ISDA, along with the Master Give-Up Agreements (which have

similar forum selection clauses) create a sufficiently close relationship between Defendants and

Alpari, making it foreseeable that Defendants would pursue Alpari under the terms of these

agreements regarding disputes related to trades within the prime brokerage relationship.  *See*

*Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99 CIV. 10550 (SHS), 2000 WL 1277597, at

*4-5 (S.D.N.Y. Sept. 7, 2000) (finding that non-signatory defendant may enforce the forum

clause against plaintiff because, among other things, the plaintiff had reason to know that the

agreement involved benefits for the non-signatory defendants, which could then be bound up in

disputes involving improper conduct under the agreement).[29]  Because Alpari could trade with

---

[28] Although the Second Circuit has not ruled on when a signatory to an agreement may enforce a forum clause against a non-signatory, a number of district courts have used the "closely related" standard discussed above for this inquiry.  *See, e.g.*,  *KTV Media Int'l v.Galaxy Group, LA LLC*, 812 F. Supp. 2d 377, 386 (S.D.N.Y. 2011); *In re Refco Inc., Sec. Litig.*, No. 07-MDL 1902 (JSR), 2009 WL 5548666, at *10-11 (S.D.N.Y. Nov. 16, 2009) (discussing cases applying the "closely related" standard to enforcement against non-signatories).

[29] This analysis is not changed by the provision stating that "a person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement."  Cohen Decl. Ex. 3 ¶ 8(f); Januszewski Decl. Ex. 3 ¶ 9(g).  Instead, this provision "simply forecloses one particular legal basis upon which to assert such a right."  *See F5 Capital v. RBS Securities, Inc.*, No. 3:14-CV-1469 (VLB), 2015 WL 5797019, at *6 (D. Conn. Sept. 30, 2015), *aff'd*, 692 F. App'x 66 (2d Cir. 2017).  For example, it would not override

27

Defendants only by way of its prime brokerage agreement with Morgan Stanley, the Alpari-MS

ISDA agreement is an essential predicate to the transactions at issue, even though it is not

between Defendants and Alpari directly.  *Cf. SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600

F.3d 1334, 1337 (11th Cir. 2010) (considering a prime brokerage agreement as a "relationship-

forming contract" which was "central" to the plaintiff's claim).  Similarly, through the Master

Give-Up Agreements and FX Give-Up Notices, Alpari could transact with Defendants, as

Morgan Stanley's agent, thereby creating an alignment of interests between Alpari and RBS and

Alpari and Credit Suisse.  As beneficiary to the arrangement between the prime broker and the

Defendants RBS and Credit Suisse, it was reasonably foreseeable to Alpari that these Defendants

would seek to enforce the forum selection clauses contained in the Master Give-Up Agreements

against it.  *See Overseas Ventures, LLC v. ROW Mgmt., Ltd., Inc.*, No. 12 Civ. 1033(PAE), 2012

WL 5363782, at *6 (S.D.N.Y. Oct. 26, 2012) (finding that a sales representative who was a non-

signatory to a sales agreement could be bound by that agreement's forum clause where he acted

as a broker and agent to signatories of the agreement).

In addition, Alpari's implied contract claims are covered by the broad language of the

clause in the Alpari-MS ISDA and Master Give-Up Agreements, given that the language of each

extends the clause beyond those claims "arising out of" the agreement.  *See* Januszewski Decl.

Ex. 2 at Schedule, Part(h)(b) (stating the forum selection clause applies to "any suit, action or

proceedings relating to any dispute, whether contractual or non-contractual, arising out of *or in*

*connection with this Agreement*" (emphasis added)); Cohen Decl. Ex. 3 ¶¶ 1, 8(e); Januszewski

Decl. Ex. 3 ¶¶ 1, 9(d) (stating the forum selection clauses apply to "any suit, action or other

proceedings *relating to this [Give-Up] Agreement*" (emphasis added)).

---

the application of traditional estoppel principles to foreclose Alpari from taking the position that this matter should
not be arbitrated.

When faced with forum clauses containing similar language, courts have interpreted the phrase broadly, *see Phillips*, 494 F.3d at 389-90, and found that the clause extends to claims beyond breach of that contract to, for example, unjust enrichment or fraud claims, because such claims "depend upon the existence of a contractual relationship between the parties." *See In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *28-29 (S.D.N.Y. Aug. 4, 2015) (discussing clause as contained in ISDA Agreement, which contained the phrase "relating to this Agreement"); *YWCA v. HMC Entm't, Inc.*, No. 91 Civ. 7943 (KMW), 1992 WL 279361, at *4 (S.D.N.Y. Sept. 25, 1992) (rejecting the assertion that the forum clause was "irrelevant" to the plaintiff's non-contractual claims for declaratory judgment because defendants' potential claims for trademark violation and misappropriation stemmed from the parties' business relationship under the contract).

Moreover, when analyzing whether a forum selection clause applies to a plaintiff's particular claims, a court does not rest on the plaintiff's legal assertions but instead "examine[s] the substance of those claims, shorn of their labels." *Phillips*, 494 F.3d at 388. As a result, "[a] forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship." *Cuno, Inc. v. Hayward Indust. Prod., Inc.*, No. 03 CIV. 3076 (MBM), 2005 WL 1123877, at *4 (S.D.N.Y. May 10, 2005) (citation omitted). Instead, where a plaintiff's claims "ultimately depend on the existence of a contractual relationship between the parties," a forum clause will be enforced as to those claims. *Id.* at *5 (quoting *Direct Mail*, 2000 WL 1277597, at *6).

Although Alpari attempts to plead around the prime brokerage arrangement by asserting solely implied contract claims, Alpari's ability to transact with Defendants depended upon the

29

existence of the Alpari-MS ISDA and the complementary Master Give-Up Agreements that form the basis of the prime brokerage relationship.  Because the relevant clauses submit to English jurisdiction disputes "arising out of or in connection with this Agreement," (Januszewski Decl. Ex. 2 Schedule, Part 4(h)(b)), and any proceedings "relating to this [Give-Up] Agreement," (Cohen Decl. Ex. 3 ¶¶ 1, 8(e); Januszewski Decl. Ex. 3 ¶¶ 1, 9(d)), the scope of the clauses includes the substance of Alpari's claims, which relate to, and depend on, the prime brokerage agreements.  As a result, these clauses compel litigation in England.

## CONCLUSION

For the reasons discussed herein, Defendants respectfully submit that the Court should grant their motion to compel arbitration pursuant to Sections 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, or, alternatively, dismiss the case pursuant to the doctrine of *forum non conveniens*.

Dated:   New York, New York
         December 7, 2017


ALLEN & OVERY LLP                              CAHILL GORDON & REINDEL LLP

___/s/ Laura R. Hall_____                   ___/s/ David G. Januszewski____
David C. Esseks                                David G. Januszewski
Laura R. Hall                                  Herbert S. Washer
Rebecca Delfiner                               Elai Katz
1221 Avenue of the Americas                    Jason M. Hall
New York, NY 10020                             Sheila C. Ramesh
Telephone: 212-610-6300                        80 Pine Street
david.esseks@allenovery.com                    New York, NY 10005-1702
laura.hall@allenovery.com                      Telephone: 212-701-3000
rebecca.delfiner@allenovery.com                djanuszewski@cahill.com
                                               jhall@cahill.com
*Counsel for Defendant BNP Paribas*
                                               *Counsel for Defendants Credit Suisse
                                               Group AG; Credit Suisse AG; and
                                               Credit Suisse Securities (USA), LLC*


DAVIS POLK & WARDWELL LLP

___/s/ Joel M. Cohen_____
Joel M. Cohen
Melissa C. King
Jennifer A. Prevete
450 Lexington Avenue
New York, NY 10017
Telephone: 212-450-4000
joel.cohen@davispolk.com
melissa.king@davispolk.com
jennifer.prevete@davispolk.com

*Counsel for Defendants The Royal Bank of
Scotland Group plc and RBS Securities Inc.*